# In the United States Court of Federal Claims

No. 15-189C
(Filed Under Seal: December 4, 2015)
(Reissued for Publication: December 15, 2015)[*]

*******************************************
| | | |
|---|---|---|
| EXCELSIOR AMBULANCE SERVICE, INC., | * | |
| | * | Bid Protest; Solicitation; Department |
| Plaintiff, | * | of Veterans Affairs; RCFC 52.1; |
| | * | Cross-Motions for Judgment on the |
| v. | * | Administrative Record; SDVOSB; |
| | * | Corrective Action; Ambulance |
| THE UNITED STATES, | * | Services; FAR 52.219-14; |
| | * | FAR 15.306(a); FAR 15.306(e)(1); |
| Defendant. | * | VAAR 852.219-10 |

*******************************************

James E. Krause, Jacksonville, FL, for plaintiff.

Melissa L. Baker, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

This postaward bid protest is before the court on the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff, Excelsior Ambulance Service, Inc. ("Excelsior" or "plaintiff"), challenges an award of a contract for ambulance services to LMC Med Transportation, LLC ("LMC") by the United States Department of Veterans Affairs ("VA"). After plaintiff filed this protest, defendant took corrective action, and then confirmed its award to LMC. Plaintiff challenges, inter alia, the manner in which the VA conducted the corrective action, and the ultimate award to LMC. For the reasons set forth below, plaintiff's motion for judgment on the administrative record is granted, and defendant's cross-motion for judgment on the administrate record is denied.

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on December 15, 2015. The redactions are indicated with bracketed ellipses ("[. . .]").

## I. BACKGROUND

### A. Solicitation

On August 29, 2014, the VA issued solicitation number VA247-14-R-0828 for ambulance services for William Jennings Bryan Dorn VA Medical Center in Columbia, South Carolina.[1]  AR 13, 119.  The solicitation provided that a firm fixed-price contract would be 100% set aside for a Service-Disabled Veteran-Owned Small Business ("SDVOSB").  Id. at 13, 122, 236.  The contract encompassed a one-year base period with four one-year option periods.  Id. at 236.  Two amendments to the solicitation were issued.  Id. at 229, 339.  The second amendment altered paragraph B.5 of the solicitation to require that:  "The contractor shall be licensed to work in the State of South Carolina."  Id. at 339.  The second amendment also extended the deadline for the submission of proposals to September 15, 2014.  Id.

### B. Evaluation Criteria and Methodology

In the solicitation, the VA explained that the contract would be awarded to the offeror with the lowest priced technically acceptable proposal.  Id. at 321.  To accomplish this goal, the VA would evaluate the offerors' proposals with respect to four factors:  1) Technical Approach and Management Capability; 2) Staff Experience and Qualifications; 3) Relevant Experience and Past Performance; and 4) Cost/Price.  Id. at 321-23.  The proposals would be rated as either "Acceptable" or "Unacceptable" for each of these factors.  Id. at 323.  Once proposals were determined to be "technically acceptable," the award would be made "based on cost/price only." Id.

### C. Evaluation of Proposals, Agency Protest, and Award

The VA received four proposals in response to the solicitation.  Id. at 1048.  Of these, two were nonresponsive because those offerors were not certified SDVOSBs.  Id.  The two remaining proposals, which were submitted by plaintiff and LMC, were both deemed technically acceptable.  Id.

The VA then requested that plaintiff and LMC provide their best and final offers regarding price.  Id. at 954, 1024.  Excelsior did not change its price of [. . .].  Id. at 1024, 1043.  LMC, however, reduced its original price of [. . .] to [. . .].  Id. at 994.  The VA conducted a price analysis of both final offers and determined that LMC had provided the lowest priced technically acceptable proposal.  Id. at 1047-50.

On November 3, 2014, Excelsior received an unsuccessful offeror notification, and requested a debriefing.  Id. at 1175, 1185.  Excelsior then filed an agency-level protest on November 13, 2014.  Id. at 1176.  After being debriefed by the VA, Excelsior amended its agency-level protest on December 3, 2014.  Id. at 1195-96.  The VA dismissed in part and denied in part Excelsior's protest on February 19, 2015.  Id. at 1224.  On February 27, 2015, the VA awarded the contract to LMC.

---

[1]  The court derives the facts from the Administrative Record ("AR").

## II.  PROCEDURAL HISTORY

On that same date, February 27, 2015, Excelsior filed the present protest.  Subsequently, on March 20, 2015, defendant filed a notice indicating that it had elected to take corrective action, and later filed a motion to dismiss the protest as moot.  Plaintiff filed a response requesting that the motion be denied pending final agency publication of corrective action.  On June 29, 2015, the court stayed proceedings pending defendant's completion of the corrective action.  During the corrective action, defendant sent each offeror a letter asking it to clarify how it intended to ensure that "at least 50 percent of the cost of personnel for contract performance" would be expended for employees of the offeror or of other eligible SDVOSBs, as required by section 852.219-10(c) of the VA Acquisition Regulation ("VAAR").  Id. at 1290-91.  Each offeror responded to the request for clarification.  Id. at 1268-70.

In a joint status report filed on August 31, 2015, the parties informed the court that upon taking corrective action, the VA confirmed the contract award to LMC.  The VA made no written findings nor provided any discussion or analysis explaining the basis for its decision to confirm the contract award to LMC based on the corrective action.  Plaintiff indicated in the status report that it intended to proceed with its protest.  On September 18, 2015, plaintiff amended its complaint to include the allegation that the VA's contract award to LMC during the corrective action was arbitrary and capricious, without a rational basis, and contrary to the terms of the solicitation.  The parties have filed cross-motions for judgment on the administrative record, which are fully briefed.  Oral argument was conducted on November 10, 2015.

## III.  LEGAL STANDARDS

### A.  Motions for Judgment on the Administrative Record

The parties have moved for judgment on the administrative record pursuant to RCFC 52.1(c).  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[2]).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, 404 F.3d at 1356.

### B.  Bid Protests and Corrective Action

The United States Court of Federal Claims ("Court of Federal Claims") has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  When resolving a motion that arises from a bid

---

[2] The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1 was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

3

protest, the court reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  Id. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  "The arbitrary and capricious standard applicable [in bid protests] is highly deferential."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  Thus, when a protester claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial."  Impresa, 238 F.3d at 1333 (internal quotation marks omitted).

During a procurement, an agency may elect to undertake corrective action.  The United States Court of Appeals for the Federal Circuit has held that this court possesses jurisdiction to review an agency's corrective action.  See, e.g., Centech Grp., 554 F.3d at 1037-38, 1040 (finding that the Court of Federal Claims's determination regarding the agency's decision to take corrective action was appropriate); Chapman Law Firm v. United States, 490 F.3d 934, 938 (Fed Cir. 2007) (holding that the Court of Federal Claims's inquiry into the reasonableness of the government's proposed corrective action was proper); accord Centech Grp., Inc. v. United States, 78 Fed. Cl. 496, 506 (2007) ("this Court possesses jurisdiction to determine if the corrective action taken by a procuring agency as a result of a bid protest was reasonable under the circumstances"); Delaney Constr. Corp., 56 Fed. Cl. 470, 474 (2003) (finding that the plaintiff had standing to initiate a protest challenging the propriety of a corrective action).  When this court undertakes review of a corrective action, it does so pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  Centech Grp., 554 F.3d at 1037.  "Contracting officers are provided 'broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.'"  Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010) (citation omitted).  Nonetheless, "the chosen corrective action must be 'reasonable under the circumstances.  To be reasonable, the agency's corrective action must be rationally related to the defect to be corrected."  Id.  The court "determine[s] whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  Impresa, 238 F.3d at 1332 (citation and internal quotation marks omitted).

## IV. DISCUSSION

### A. The Parties' Arguments

In its motion, Excelsior raises four arguments, two of which the court finds persuasive and that are addressed in this ruling.  First, plaintiff contends that LMC's proposal was not technically acceptable because LMC did not possess the requisite business license to operate in South Carolina at the time that it was awarded the contract.  Pl.'s Mot. 3.  Indeed, Excelsior notes that LMC only obtained the requisite business license after this protest was filed.  Id. at 16-

4

18, 21. Thus, plaintiff argues that LMC's proposal was not technically acceptable at the time of submission. Id. In addition, Excelsior asserts that LMC did not possess an Ambulance Service license issued by South Carolina, nor a license for the city of Columbia, both of which are required by the state of South Carolina, and accordingly, by the solicitation. Id. at 23. For these reasons, Excelsior urges the court to find that the contract award to LMC violated material terms of the solicitation. Id.

Second, Excelsior argues that the VA's decision to award the contract to LMC was arbitrary and capricious, without a rational basis, or contrary to law because it exceeded the scope of the corrective action that it defined. Excelsior relies on VAAR 852.219-10(a), which defines an SDVOSB as a small business whose management and daily business operations are controlled by one or more service-disabled veterans. Id. at 24-28, 33. According to Excelsior, VAAR 852.219-10(c) requires SDVOSBs to perform at least 50% of a contract like the one that is the subject of this case. Id. at 26. Excelsior asserts that because LMC's original proposal provided that LMC would subcontract all ambulance service requirements to other entities that were not SDVOSBs, LMC's proposal did not conform to the terms of the solicitation. Id. Subsequent to plaintiff's challenge to LMC's purported violation of the 50% requirement, the VA elected to take corrective action.

During corrective action, the VA directed plaintiff and LMC to clarify how they intended to ensure that at least 50% of the cost of personnel for contract performance would be expended for employees of eligible SDVOSBs. According to Excelsior, LMC did not merely clarify its original proposal, but rather, rewrote it to provide that 51% of the contract would be performed by LMC and another SDVOSB. Id. at 29. Excelsior asserts that LMC made this postaward modification to belatedly meet the solicitation requirement that at least 50% of the contract be performed by SDVOSBs. Id. Thus, Excelsior argues, because the corrective action was limited to clarifying existing proposals, the VA acted in a manner that was arbitrary and capricious, without a rational basis, or contrary to law when it permitted LMC to rewrite its original proposal to conform to the VAAR and the requirements of the solicitation. Id. at 30. For these reasons, Excelsior contends, the VA's confirmation of the award to LMC was unreasonable and cannot withstand legal scrutiny. Id.

In its cross-motion, defendant argues that because LMC initially provided the VA with its Texas business license, along with the South Carolina business licenses of its subcontractors, LMC satisfied the solicitation's requirement that proposals should include business licenses. Def.'s Cross-Mot. 15. According to defendant, the solicitation's requirement that an offeror provide its business license was not a criterion that determined responsiveness and eligibility for award, but rather, a responsibility that the awardee could fulfill at any time prior to or even after award. Id. at 20; Oral Argument of November 10, 2015, Argument of Ms. Melissa L. Baker at 2:10:20.[3] The crux of defendant's argument is that the licensing requirement relates to contract administration, not to contract award. Def.'s Cross-Mot. 20; Oral Arg. 2:04:40, Nov. 10 (Baker).

---

[3] The oral argument held on November 10, 2015, at 1:00 p.m. eastern standard time was recorded using the court's Electronic Digital Recording ("EDR") system. The times noted in citations to the oral argument refer to the EDR of the oral argument.

Defendant also contends that South Carolina law does not require that an offeror possess a state business license at the time that the proposal is submitted.  Def.'s Cross-Mot. 16.

In addition, defendant argues, the VA reasonably understood that LMC was a responsible offeror that would comply with the requirement that at least 50% of personnel costs should be incurred by qualified SDVOSBs.  Id.  LMC's response to the VA's request for clarification during the corrective action only confirmed this understanding, defendant asserts.  Id.  If LMC fails to comply with this requirement in the future, defendant contends, it is a matter of contract administration, not of contract award.  Id.

Finally, defendant argues that during the corrective action, the VA did indeed reevaluate whether the offers were responsive to all solicitation requirements, thereby carrying out the type of corrective action that it had described in its notice.  Id. at 31.  According to defendant, when the VA sought clarification from the two offerors, the information that LMC provided was straightforward, and reassured and confirmed for the contracting officer that his earlier conclusions were correct.  Id.  Defendant asserts that because it was clear from LMC's response that it would comply with the requirement mentioned in the corrective action, there was no need for additional explanation.  Id.

### B.  Analysis

Upon review of the parties' legal memoranda and representations at oral argument, the court determines that there are two independent grounds to sustain plaintiff's protest as discussed in more detail below.

### 1.  Defendant's Decision to Award the Contract to LMC, Despite LMC's Failure to Provide the Business License Required by Factor One of the Solicitation, was Arbitrary and Capricious, Without a Rational Basis, and Contrary to a Material Term of the Solicitation

The court first examines the parties' dispute regarding the requirement for each offeror to provide the VA with its business license.  The opening paragraph of the solicitation stated:

> The purpose of this requirement is to furnish 24 hours, 7 days a week ambulance service consisting of basic life support and advance life support transportation services for the beneficiaries of the Veterans Administration Williams Jennings Bryan Dorn (WJBD) VA Medical Center, Columbia, South Carolina and affiliated community based outpatient clinics.  This shall include urgent or emergent requirements and non-emergency requirements.

AR 235.  Further, paragraph B.5 of the solicitation provided that "[t]he contractor shall be licensed to work in the State of South Carolina."  Id. at 339.  Moreover, a subsection of section E the solicitation provided:

EVALUATION FACTORS FOR AWARD

a. **BASIS FOR CONTRACT AWARD**:  This acquisition will utilize Lowest Price Technically Acceptable (LPTA) source selection procedures in accordance with [Federal Acquisition Regulation ("FAR")] 15.101-2, as supplemented.  This is a competitive LPTA best value source selection in which technical acceptability is the most important factor. By submission of this offer, the Offeror accepts all solicitation requirements, including terms and conditions, representations and certifications, and technical requirements.  All technically acceptable offerors with acceptable past performance shall be treated equally except for their prices.  <u>Failure to meet a requirement may result in an offer being determined technically unacceptable</u>.  Offerors shall clearly identify any exception to the solicitation and conditions and provide complete accompanying rationale.

The Government <u>intends to select ONE contractor</u> for award of this effort.

<u>For the purpose of award, the Government shall evaluate offers based on the evaluation factors described below:</u>

**Factor 1:  Technical Approach and Management Capability**

● <u>Provide business license and must be classified under the NAICS code of 621910.</u>

● <u>Provide management and operation plan (capability statement); must specify the ability to manage and provide service directly related to the ambulance services</u>.

● Provide a list of all vehicles in fleet to include make, model, and age of each vehicle.  Vehicles should not be older than 2008.

● <u>Describe how the firm will provide backup coverage for services in emergencies and unusual situations.</u>

● Provide copy of the Personnel Training Manual

● Offeror must be registered and verified in VetBiz.gov.  Vendor Information Pages (http://www.VetBiz.gov).

<u>Id.</u> at 321-22 (emphasis added).

Under the subsection entitled "Evaluation Factors for Award" and subtitled "Basis for Contract Award," the solicitation required that an offeror "[p]rovide [a] business license." <u>Id.</u> at 321.  Further, when determining whether an offeror was technically acceptable, the VA would evaluate three factors, the first of which was "Technical Approach and Management Capability." <u>Id.</u>  To assess whether an offeror met this factor, the VA examined six criteria; the requirement to provide a business license was identified as the first of these criteria.  <u>Id.</u>  Thus, because submitting a business license was essential to satisfying the first of the three factors, the VA

7

could not ignore this solicitation requirement when determining whether a proposal was technically acceptable.

Other requirements under "Factor 1: Technical Approach and Management Capability" included that an offeror must "[p]rovide [a] management and operation plan (capability statement); must specify the ability to manage and provide service directly related to the ambulance services," and must "[d]escribe how the firm will provide backup coverage for services in emergencies and unusual situations." Id. at 322. Given these unambiguous requirements, it would be irrational for the VA to permit an offeror to provide its management and operation plan or describe how its firm would provide backup emergency coverage postaward. Rather, this type of information is essential to permit the VA to render an appropriate eligibility determination. Just as the second and third elements of Factor 1 were mandatory for technical acceptability, so too was the first element, the business license requirement. Accordingly, the provisions under paragraph B.5 of the solicitation that an offeror/contractor must be licensed to work in South Carolina, and that it must provide defendant with that business license, were requirements pertaining to technical acceptability, and thus, in assessing eligibility for contract award. These requirements should have been satisfied at the time of proposal submission, and were not an administrative responsibility that an offeror could fulfill postaward, as defendant incorrectly asserts.

Rather than providing a South Carolina business license when submitting its proposal, LMC waited until March 4, 2015 to acquire one, well after the contract was awarded and this protest was filed. Am. Compl., Ex. 1 at 7. Defendant admits as such. See Def.'s Cross-Mot. 5. Consequently, LMC failed to comply with a material term of the solicitation concerning technical acceptability, thus rendering it ineligible for contract award. The fact that LMC provided its Texas business license, along with the South Carolina business licenses of its subcontractors, with its proposal is unavailing. LMC failed to meet a material term of the solicitation because the contractor, not one of its subcontractors, was required to be licensed in South Carolina at the time of proposal submission.

Defendant cites Bailey Tool & Manufacturing Co. v. United States. 117 Fed. Cl. 457, 466 (2014) to support its view that the business license was only a matter of contract administration. In that decision, the Court of Federal Claims noted that the Comptroller General of the United States ("Comptroller General") held in Integrated Protection Systems, Inc. that a solicitation provision requiring a prospective contractor to obtain a specific license or permit relates to the prospective contractor's responsibility and may be satisfied at any time prior to award. Id. (citing Integrated Prot. Sys., Inc., B-254457 et al., 1994 WL 29886, at *2 (Comp. Gen. Jan. 19, 1994). Defendant here argues that the Comptroller General's holding applies in this case. That finding is inapposite here, as the solicitation in this case required that the business license be "[p]rovide[d]" to the VA, AR 321, rather than merely "obtained," Integrated Prot. Sys., Inc., at *2. In other words, whereas acquiring a license in Integrated Protection Systems, Inc. was a general responsibility that had to be fulfilled at some point prior to award, here, providing a license was an express requirement in determining whether an offeror met the evaluation factors for award. AR 321. Further, the decision in Integrated Protection Systems, Inc. fails to assist defendant for yet another reason. As the Comptroller General explained in that

8

case, the license requirement "may be satisfied at any time prior to award." Integrated Prot. Sys., Inc., 1994 WL 29886, at *2. Thus, applying the holding in Integrated Protection Systems, Inc. here, because LMC obtained its South Carolina license after it was awarded the contract, it was ineligible for contract award. Accordingly, because LMC's proposal was technically unacceptable and ineligible for award at an early stage of its evaluation, the VA's subsequent award of the contract to LMC was arbitrary and capricious, without a rational basis, and contrary to a material term of the solicitation.[4] Cf. Nilson Van & Storage, Inc., B-403009, 2010 WL 3328658, at *1-2 (Comp. Gen. Aug. 19, 2010) (finding that because the invitation for bids stated that the "offeror shall furnish to the Government, if requested, copies of [Interstate Commerce Commission] authorization before moving the material under any contract awarded," an offeror providing the authorization was not a prerequisite to receiving the award, but instead, only applied to the winning contractor after contract award (emphasis added)); see also Centech Grp., 554 F.3d at 1038 ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." (citation and internal quotation marks omitted)); Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1368 (Fed. Cir. 1999) (affirming the trial court's holding that the government agency was "strictly bound by [the] terms" of the solicitation, and that the agency violated "applicable statute and regulation" when waiving a portion of such terms for the contract awardee); Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012) ("It is blackletter law that a procuring agency may only accept an offer that conforms to the material terms of the solicitation.").

2. **By Permitting LMC to Rewrite Its Proposal During the Corrective Action to Conform to the Requirements of the Solicitation, the VA Acted in a Manner That Was Arbitrary and Capricious, Without a Rational Basis, and Contrary to Law**

Next, the court turns to plaintiff's contention that the VA improperly allowed LMC to modify and rewrite its proposal during the corrective action, rather than merely submit

---

[4] Defendant also argues that offerors should be allowed to obtain a business license after contract award because otherwise, government agencies would be restricted to receiving contract proposals only from offerors who are licensed in the pertinent state prior to contract award. Oral Arg. 2:10:20. Defendant's argument lacks merit. Permitting a contract awardee to obtain a requisite business license after contract award would promote inefficiency and a potential waste of government resources. If an offeror applied for the requisite business license after contract award, and its license application was then denied for any reason, the procuring agency would have to reopen the evaluation of proposals and, potentially, the procurement. In any event, defendant's argument is irrelevant here, because providing a South Carolina business license at the time of proposal submission was a material requirement of the solicitation, as it was an evaluation criterion in determining technical acceptability.

It bears noting that this procurement concerns a contract to provide ambulance services for veterans. The vital nature of the services to be provided pursuant to this contract bolsters this court's finding that the business license element under Factor 1 was a requirement to be satisfied prior to contract award, and was not merely a matter of contract administration.

9

clarifications to its proposal. Plaintiff argues that the VA thus exceeded the scope of the corrective action, rendering its confirmation of the contract award to LMC arbitrary and capricious, without a rational basis, or contrary to law. As described earlier, the solicitation provided that the contract would be 100% set aside for an SDVOSB. AR 13, 122. VAAR 852.219-10(a) defines an SDVOSB:

> Definition. For the Department of Veterans Affairs, "Service-disabled veteran-owned small business concern":
>
> (1) Means a small business concern:
>
> (i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans (or eligible surviving spouses);
>
> (ii) The management and daily business operations of which are controlled by one or more service-disabled veterans . . . .

Further, FAR 52.219-14 describes requirements regarding "contracts that have been set aside or reserved for small business concerns." It provides:

> (c) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for—
>
> (1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

FAR 52.219-14(c). In addition, VAAR 852.219-10(c) sets forth:

> A service-disabled veteran-owned small business concern agrees that in the performance of the contract, in the case of a contract for:
>
> (1) Services (except construction), at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern or employees of other eligible service-disabled veteran-owned small business concerns;

These regulations, taken together, require that for contracts performed by SDVOSBs, at least 50% of the cost of personnel must be expended for employees of an SDVOSB.

There is no dispute that LMC is an SDVOSB. AR 1268. However, LMC's original proposal provided:

> As detailed in our management and Operation plan below, LMC Med Transportation will be managing and performing quality assurance and control on

10

> this contract. We have selected Regional Ambulance to subcontract to perform the BLS and ALS Ambulance Service. Our backup plan is to utilize either in full or in part Palmetto Ambulance.

Id. at 375. Thus, LMC's original proposal made clear that it would subcontract all of its ambulance services to an entity that was not an SDVOSB.[5] Further, LMC submitted copies of business licenses for Regional Ambulance Services, Inc. ("Regional Ambulance"), Palmetto Ambulance, and Community Pastor Care, LLC ("CPC"). Id. at 385-92. LMC also provided a "List of All Vehicles in Fleet," in which it listed vehicles used by Regional Ambulance, as well as those used by CPC. Id. at 397-98. In addition, LMC submitted a chart with a list of drivers that worked for Regional Ambulance. Id. at 400. LMC provided no comparable licenses, list of vehicles, or list of drivers for itself.

Subsequently, when Excelsior filed the present protest, it alleged that LMC had not satisfied the requirement that at least 50% of the contract must be performed by an SDVOSB. Thereafter, defendant took corrective action and sought clarification from the offerors regarding this issue. Defendant sent identical letters to Excelsior and to LMC, explaining:

> Upon review of the record, a determination has been made to take corrective action on the reference solicitation. The corrective action requires that each offeror clarifies [its] ability to comply with the contracting limitations as outlined in [VAAR] 852.219-10(c)(1). . . . The clarification must clearly address how the offeror intends to insure [sic] that "at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern or employees of other eligible veteran-owned small business concerns."
>
> . . . .

Id. at 1290-91. When LMC responded to defendant's request for clarification, LMC stated that it was an SDVOSB, and that "[t]hroughout the life of [the] contract, on average[,] LMC [would] be

---

[5] In its cross-motion, defendant explains that "LMC's proposal indicated that LMC would subcontract many of the Ambulance Service requirements to another local SDVOSB, Community Pastor Care, as well as to another firm, Regional Ambulance." Def.'s Cross-Mot. at 12. Further, in its revised proposal, LMC stated that "(LMC), a[n] SDVOSB, will provide all the vehicles, personnel, and equipment to service beneficiaries originating in Richland County . . . . . LMC will subcontract to Community Pastor Care, LLC. (CPC) another SDVOSB, the following areas under this contract: . . . . LMC will also subcontract the Orangeburg area to Regional Ambulance Services, Inc., which includes the following: . . . ." AR at 1268. LMC's rewritten proposal concluded, "[i]n summation, LMC and CPC, both SDVOSBs will take on and perform a minimum of 51% of the cost, labor and performance of this contract each year. On average over the life of the contract, LMC and CPC will perform a combined average of 59.78%, while Regional Ambulance Service will perform on average 40.22." Id. at 1269. It is evident based on both defendant's and LMC's description of LMC and CPC as SDVOSBs, and subsequent reference to Regional Ambulance with no such qualification, that Regional Ambulance is not an SDVOSB.

11

responsible for at least 25% of the cost and personnel performance [sic]." Id. at 1268. LMC further provided that it would "subcontract to Community Pastor Care, another SDVOSB," such that CPC would "be responsible for an average of 35% of the cost and personnel performance [sic] over the life of [the] contract." Id. In addition, LMC stated that Regional Ambulance would be "responsible for an average of 40% of the . . . cost and personnel performance throughout the life of [the] contract." Id. at 1268-69. LMC then concluded:

> In summation, LMC and CPC, both SDVOSBs[,] w[ould] take on and perform a minimum of 51% of the cost, labor and performance of this contract each year. On average over the life of [the] contract, LMC and CPC [would] perform a combined average of 59.78%, while Regional Ambulance Service [would] perform on average 40.22% over the same five-year term.

Id. at 1269.

It is evident that there were substantial differences between LMC's original proposal and its response to the VA's request for clarification during the corrective action. FAR 15.306(a) provides that "[c]larifications" constitute "limited exchanges, between the Government and offerors," where "offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." LMC's original proposal indicated that the ambulance services would be provided by its subcontractor, Regional Ambulance, and if needed as a backup, Palmetto Ambulance. There can be no serious dispute that LMC's original proposal was to subcontract 100% of the ambulance services. However, when LMC later responded to the VA's request for clarification, LMC rewrote its original proposal to conform to the requirements of the solicitation. Rather than attribute 100% of the costs of ambulance services to Regional Ambulance, in its revised proposal submitted in response to the VA's clarification request, LMC claimed that its subcontractor would only account for 40% of the cost of personnel for contract performance. This major change to LMC's proposal cannot be reasonably construed as a mere correction of a typographical error or an additional explanation to clarify an ambiguity in its original proposal. To the contrary, the VA erred by permitting LMC to exceed the scope of clarification and make substantial revisions to its proposal so that the proposal would satisfy the requirements of the solicitation.

LMC's purported clarification also explained that LMC intended to be responsible for 25% of the cost of personnel for contract performance. However, according to LMC's original proposal, LMC's participation was limited to contract oversight. In addition, although LMC's purported clarification stated that CPC would be responsible for 35% of the cost of personnel for contract performance, there was no mention in the original proposal of CPC providing any services, not even as a backup. Although LMC did furnish copies of CPC's business licenses in the original proposal, there was no discussion of any work that it would perform under the contract. Moreover, whereas Palmetto Ambulance was identified as a backup subcontractor in the original proposal, it was removed from LMC's revised proposal. Thus, LMC's clarification did far more than just amplify certain aspects of its original proposal or resolve minor or clerical errors. To the contrary, LMC added itself and a new subcontractor to the rewritten proposal,

12

removed a backup subcontractor from the original proposal, and reduced the amount of services that would have been provided by the main subcontractor that it originally proposed. Consequently, whereas the letter sent by the VA during the corrective action only requested clarification of LMC's original proposal, LMC responded by making major revisions to its proposal, in violation of the terms of the request. The VA accepted LMC's revised proposal that was altered to conform to the solicitation, resulting in an unfair competitive advantage for LMC that greatly prejudiced plaintiff.

By contrast, plaintiff made no changes to its proposal when responding to the VA's request for clarification during the corrective action. In its original proposal, plaintiff submitted a chart that provided a breakdown of prices for ambulance services. Id. at 1009. Plaintiff stated that its employees were "paid in accordance with the appropriate Wage Determination Schedule, satisfying all federal contracting requirements . . . ." Id. at 1005. Further, plaintiff provided a copy of a letter from the VA verifying that Excelsior was an SDVOSB. Id. at 1021. Plaintiff's original proposal also included a copy of its certificate of liability insurance. Id. at 1022.

In its response to defendant's request for clarification, plaintiff stated that it was a certified SDVOSB, in accordance with the verification that it had provided originally. Id. at 1270. Further, Excelsior explained that it would be "self-performing 100% of the contract with [its] employees being paid at the required wages set by the Wage Determination and [with] Excelsior owned equipment." Id. Plaintiff also indicated that "[i]f at some point the volume of calls to a particular outlying area is very small, [it] might consider subcontracting that small percentage of the business to another local ambulance company with other work in that area, with VA approval, but that would generally be less than 5% of the contract." Id.

In plaintiff's original proposal, it confirmed that its employees were paid according to the appropriate Wage Determination Schedule, and it repeated this description in its subsequent response letter. Moreover, plaintiff provided a chart with a list of service prices in its original proposal. Thus, when plaintiff later explained that all services would be performed by its employees, and that, if necessary, five percent of the services could be carried out by a subcontractor, it was a statement that clarified and elaborated on the chart that plaintiff previously had provided with its original proposal.

Finally, plaintiff explained in its clarification that it had an established office in Columbia, South Carolina, and that it would provide an Excelsior manager as the primary contact person for the VA from that office. Id. In doing so, Excelsior supplied the VA with further details about the nature of the contract performance that it had originally proposed. Indeed, all of the information that plaintiff included in its response to the VA's request for clarification did just that, namely, provide clarification; plaintiff did not modify its original proposal in any way.

LMC's responses to the VA's request for clarification far exceeded the scope of the VA's clarification request because they modified LMC's original proposal to make it compliant with the terms of the solicitation. The VA should have determined that LMC's original proposal was noncompliant. When the VA later accepted LMC's revised proposal that complied with the solicitation, the VA gave LMC an unfair competitive advantage because only plaintiff's proposal

13

was technically acceptable when originally submitted. The VA thus failed to "ensure that [the offerors] received impartial, fair, and equitable treatment," as required of contracting officers by federal regulation. FAR 1.602–2(b). Indeed, "[g]overnment personnel involved in [an] acquisition" like this one "shall not engage in conduct that . . . [f]avors one offeror over another." FAR 15.306(e)(1). The VA's corrective action was therefore conducted in a manner that was unreasonable. Although the VA's request for clarification was reasonable, it acted in a manner that was arbitrary and capricious by allowing LMC to rewrite its proposal so that it would conform to the requirements of the solicitation. Moreover, the administrative record contains no documentation of the contracting officer's rationale for determining that it was reasonable to award the contract to LMC after the corrective action. Defendant admits that such documentation is "simply not there." AR at 20; Oral Arg. 2:02:13, Nov. 10 (Baker). The lack of any documentation explaining the method by which the VA re-evaluated the proposals, including any comparative analysis that it undertook based on the solicitation's requirements, precludes a finding that the VA's confirmation of the contract award to LMC had a rational basis. Accordingly, the VA conducted the corrective action in a manner that was arbitrary and capricious, without a rational basis, and contrary to law. See FAR 15.303(b)(3) ("The source selection authority shall . . . [e]nsure consistency among the solicitation requirements, notices to offerors, proposal preparation instructions, evaluation factors and subfactors, solicitation provisions or contract clauses, and data requirements . . . .").

### 3. Excelsior Was Prejudiced

Because the VA's decision to award the contract to LMC was arbitrary and capricious, without a rational basis, and contrary to law, it constituted a significant error in the procurement process. The court's next inquiry, therefore, is whether Excelsior was prejudiced by the VA's error.

If a protester demonstrates that there was "a significant error in the procurement process," it must then show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (1996); see also Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). In order to establish that it was prejudiced, a party must "show that it had a substantial chance of being awarded the contract but for the alleged violation of the procurement statute or regulation." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 494 (2013); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

In this case, there were only two offerors that the VA considered technically acceptable—plaintiff and LMC. If LMC's proposal had been properly disqualified as technically unacceptable, then Excelsior would have remained as the sole eligible offeror and been awarded the contract. In addition, the VA misused the clarification process to permit LMC to rewrite its proposal so that it would conform to the terms of the solicitation. Excelsior thus had a substantial chance of being awarded the contract if not for the VA's errors. Consequently, plaintiff was prejudiced by the VA's erroneous award of the contract to LMC. See Alfa Laval

Separation, Inc., 175 F.3d at 1367-68 (holding that when the government agency erred in awarding the contract to an offeror whose proposal was not technically compliant with the solicitation, the unsuccessful offeror was prejudiced because it had a substantial chance of receiving the award, as it was the only other proposal being considered).

## V. INJUNCTIVE RELIEF

Excelsior has demonstrated that the VA's award of the contract to LMC constituted a significant, prejudicial procurement error and that it is therefore entitled to a judgment in its favor. The court now turns to Excelsior's request for injunctive relief. Such equitable remedies are available to successful protesters under the Tucker Act. See 28 U.S.C. § 1491(b)(2) (permitting the Court of Federal Claims to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs"). "Injunctive relief is appropriate if it 'enjoin[s] the illegal action and return[s] the contract award process to the status quo ante.'" Turner Constr. Co., Inc. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (quoting Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)). In entertaining a request for permanent injunctive relief, a court must review the procuring agency's action and determine whether (1) the protester has succeeded on the merits; (2) the protester will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. Centech Grp., 554 F.3d at 1029 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

By demonstrating that the VA's award of the contract to LMC constituted a significant, prejudicial error in the procurement process, Excelsior has succeeded on the merits. The court next examines whether irreparable harm occurred. Because Excelsior has established that it was prejudiced by the VA's decision to award the contract to LMC, the court presumes that Excelsior has suffered irreparable harm. See Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("A movant that clearly establishes likelihood of success on the merits receives the benefit of a presumption of irreparable harm."). Indeed, the "denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute[s] irreparable harm." BCPeabody Constr. Serv., Inc. v. United States, 112 Fed. Cl. 502, 514 (2013). Because Excelsior was prevented from enjoying an equitable opportunity to compete, and incurred a monetary loss, it suffered irreparable harm.

In addition, the balance of hardships weighs in Excelsior's favor. Excelsior would suffer economic hardship through lost profits if LMC were to perform the contract. By contrast, defendant has not articulated any special consequences in terminating the contract awarded to LMC. The contract is currently stayed, and the services at issue are currently being provided by the incumbent contractor. Def's Cross-Mot. 34-35; AR at 20; Oral Arg. 1:44:09, Nov. 10 (Baker). Although the VA would incur a higher cost in awarding the contract to plaintiff than it would to LMC, that consideration carries little weight here because the VA failed to adhere to the terms of its solicitation and the requirements of the FAR and VAAR. Had defendant conducted the procurement fairly, it would have disqualified LMC and awarded the contract to Excelsior. Accordingly, defendant cannot demonstrate that the balance of hardships weighs in its favor. A desire for a lower-priced proposal can never justify ignoring the terms of a

solicitation and the procurement regulations promulgated in the FAR and VAAR. Moreover, "[i]f both the protester and the government stand to suffer harm in the absence of an injunction, then it makes good sense to issue the injunction." Sys. Application & Tech., Inc. v. United States, 100 Fed. Cl. 687, 721 (2011).

Finally, the public interest is served by enjoining the VA from awarding the contract to LMC. "It is well established that the public interest is well-served by ensuring that the government procurement process is fair and even-handed." BCPeabody Constr. Serv., 112 Fed. Cl. at 514; accord Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010); PGBA, LLC, 57 Fed. Cl. at 663. The VA's award of the contract to LMC would be unfair to Excelsior because it complied with the requirements of the solicitation when submitting its proposal, whereas LMC modified its proposal postaward to conform to the terms of the solicitation. The court thus finds that it would be in the public interest to provide injunctive relief.[6]

## VI.  CONCLUSION

In sum, the court finds that injunctive relief is appropriate in this case. Accordingly, it is **ORDERED** that:

- Plaintiff's motion for judgment on the administrative record is **GRANTED**.

- Defendant's cross-motion for judgment on the administrative record is **DENIED**.

- The VA is **ENJOINED** from awarding the contract to LMC.

- The VA's decision to award the contract to LMC is **VACATED** and this matter is remanded to the agency to take action consistent with this opinion, including reevaluating proposals within the technically acceptable range.

- The court has filed this opinion under seal. The parties shall confer to determine proposed redactions agreeable to both parties. Then, **by no later than Thursday, December 17, 2015,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's opinion containing proposed redactions, with all proposed redactions clearly indicated**.

---

[6] In light of this decision, the court need not reach other arguments that plaintiff raises in its motion for judgment on the administrative record.

No costs. The clerk is directed to enter judgment accordingly.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
